942 So.2d 1050 (2006)
In re Mack I. FRANK.
No. 2006-B-0727.
Supreme Court of Louisiana.
October 17, 2006.
*1052 Charles B. Plattsmier, Baton Rouge, Damon S. Manning, for Applicant.
Mack I. Frank, for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Mack I. Frank, an attorney licensed to practice law in Louisiana.

PRIOR DISCIPLINARY HISTORY
Before we examine the current disciplinary charges, we find it helpful to review respondent's prior disciplinary history. Respondent was admitted to the practice of law in Louisiana in 1973. In August 1978, respondent received a formal private reprimand from the Committee on Professional Responsibility.
In June 1985, respondent was disbarred following his federal conviction of being a principal to the interstate transportation of a counterfeit security. Louisiana State Bar Ass'n v. Frank, 472 So.2d 1 (La.1985). The disbarment was retroactive to respondent's interim suspension on March 2, 1981. Thereafter, respondent applied for readmission. On December 13, 1991, we granted respondent's application for readmission. In re: Frank, 590 So.2d 74 (La. 1991). In November 1999, respondent was admonished by the disciplinary board for providing inappropriate financial assistance to a client.

*1053 UNDERLYING FACTS

Count I  The Boxie/Stoot Matter
Respondent represented Mary Boxie in a real estate transaction wherein she purchased property in Opelousas from Joseph Stoot, a resident of California. In April 2000, Ms. Boxie gave respondent a $4,500 check for the purchase of the property. Respondent deposited the check into his personal bank account. Respondent then issued a check from his personal account payable to Mr. Stoot in the amount of $4,155. However, the check was returned for insufficient funds, causing several of Mr. Stoot's own checks to be returned. Respondent subsequently made restitution to Mr. Stoot for the NSF check, plus an additional $100. In May 2000, Mr. Stoot filed a complaint against respondent with the ODC.
In March 2001, respondent gave a sworn statement to the ODC in which he agreed under oath to provide certain documentation within thirty days, including the bank records reflecting his handling of the Boxie/Stoot funds. Respondent failed to provide the documentation. The ODC later obtained the bank records of respondent's personal account and discovered overdrafts and negative balances in the account during the time that respondent maintained the Boxie/Stoot funds.
The ODC alleges that respondent's conduct violated Rules 1.15(a) (a lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(g) (failure to cooperate with the ODC in its investigation) of the Rules of Professional Conduct.

Count II  The Unauthorized Practice of Law Matter
Respondent represented three parties in a civil matter pending in the 27th Judicial District Court for the Parish of St. Landry. On August 21, 2000, respondent represented his clients in a pre-trial conference, and on August 30, 2000, he appeared in open court to represent his clients at trial. During this period, respondent knew that he was ineligible to practice law because he had not obtained all of his mandatory continuing legal education hours for the prior year.[1] As a result, the trial judge was forced to recess the trial of the case and order a continuance.
The ODC alleges that respondent's conduct violated Rules 5.5(a) (engaging in the unauthorized practice of law) and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct.

Count III  The Harrison Matter
In 1996, Mary Harrison retained respondent to represent her sixteen-year old daughter, Shantelle Harrison, who was charged with second degree murder arising out of the death of her newborn baby. Respondent was paid $5,000 for the representation plus an additional $2,500 for expert witness fees. Respondent called no expert witnesses to testify at Shantelle's trial, but he nevertheless failed to account for or refund the expert witness fees. Respondent also failed to subpoena other witnesses whom he had told Shantelle that he planned to call at trial. In July 1998, Shantelle was convicted of second degree *1054 murder and sentenced to life in prison. Respondent told Shantelle that he would appeal her conviction; however, he failed to do so. He also failed to properly communicate with Shantelle regarding the status of her case.
In 2001, Shantelle's new counsel filed a motion for post-conviction relief and motion for new trial. At the hearing on the motion, Shantelle testified that she had been prepared to accept an offer from the State which would have allowed her to plead guilty to manslaughter, but respondent urged her to reject the plea agreement and to go to trial because he had found "the nurse, the doctor, the psychologist to testify, and that we was [sic] going to win it." However, respondent did not call any expert witnesses to testify at the trial, and Shantelle was ultimately convicted of second degree murder. Shantelle also testified that respondent told her that even if she were convicted, he would file an appeal, she would win, and she would spend no more than six months in jail. Shantelle's testimony was corroborated by that of her mother and her sisters. For his part, respondent admitted that he called no expert witnesses to testify on Shantelle's behalf, but he denied that he guaranteed a result to Shantelle or advised her to reject the State's plea offer.
Considering the testimony presented at the hearing, the trial court granted Shantelle's motion for post-conviction relief and motion for new trial. In oral reasons for judgment, the trial judge stated:
. . . In addition, the Court finds that [Shantelle's] retained attorney, Mr. Mack Frank, was ineffective and did not provide adequate counsel in this case, failing, among other things, to present any medical evidence to contradict the medical evidence . . . which was presented by the State at the trial, concerning whether or not the death of the child was intentional or was an accident.
The court is also convinced that through Mr. Frank's representations that he was going to present testimony of a nurse, psychologist, and a pathologist, which he never subpoenaed, much less required their presence at the trial, that none was given, and that he advised her not to accept the manslaughter plea which was offered, and which she would have taken, had she known all of the facts in this matter.
In May 2001, Mary Harrison filed a complaint against respondent with the ODC. Respondent answered the complaint but failed to respond to the ODC's request for supplemental information.
The ODC alleges that respondent's conduct violated Rules 1.1 (failure to provide competent representation to a client), 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.5(f)(6) (failure to refund an unearned fee), 1.16(d) (obligations upon termination of the representation), 8.4(c), 8.4(d), and 8.4(g) of the Rules of Professional Conduct.

Count IV  The Williams Matter
In May 2001, Lee Jeffery Williams paid respondent $500 to file a writ of habeas corpus on his behalf. Within two months, respondent reportedly advised Mr. Williams that he had decided not to represent him; however, respondent did not refund the fee he had been paid. Therefore, in July 2001, Mr. Williams sought assistance from the Louisiana State Bar Association (LSBA) Alternative Dispute Resolution program. Respondent failed to respond to the LSBA's efforts to arbitrate the fee dispute. As a result, in October 2001, Mr. Williams filed a complaint against respondent with the ODC, to which respondent failed to reply. Seven *1055 months later, in May 2002, respondent refunded $425 to Mr. Williams.
The ODC alleges that respondent's conduct violated Rules 1.5 and 8.4(g) of the Rules of Professional Conduct.

Count V  The Jackson Matters
In November 1999, Kerry Jackson retained respondent to represent him in three civil suits. Respondent accepted the representation on a one-third contingent fee basis, but Mr. Jackson also paid respondent $3,250 in fees at his request.
In December 1999, respondent enrolled as counsel of record for Mr. Jackson in the pending matter captioned Kerry Jackson v. Harry Lee, No. 99-0582 on the docket of the United States District Court for the Eastern District of Louisiana. In January 2000, respondent filed a memorandum in opposition to the defendant's motion for summary judgment. In April 2000, the magistrate judge recommended the dismissal of Mr. Jackson's suit with prejudice. Respondent did not file an objection to the proposed recommendation of the magistrate judge, and accordingly, in May 2000, the district judge approved the recommendation and dismissed Mr. Jackson's lawsuit. Respondent failed to properly communicate with Mr. Jackson concerning the status of the matter.
In September 2000, respondent enrolled as counsel of record for Mr. Jackson in the pending matter captioned Kerry Jackson v. City of Kenner, et al., No. 99-1916 on the docket of the Civil District Court for the Parish of Orleans. Respondent filed an opposition to the defendant's exception of prescription. In November 2000, the trial court granted the exception of prescription and dismissed Mr. Jackson's suit. Respondent filed a Notice of Intention to Apply for Supervisory Writs and was granted until December 22, 2000 to file the writ application with the Fourth Circuit Court of Appeal. However, he failed to follow through with the appeal, despite his representation to Mr. Jackson that he would do so, and the dismissal of the case is now final.
In April 2000, respondent enrolled as counsel of record for Mr. Jackson in the pending medical malpractice case captioned Kerry Jackson v. Terry Migliore, et al., No. 99-13385 on the docket of the Civil District Court for the Parish of Orleans. In May 2000, pursuant to a consent judgment between respondent and counsel for the defendants, Mr. Jackson's case was dismissed without prejudice pending the formation of a medical review panel. However, respondent did not take the steps necessary to convene the medical review panel.
In March 2003, respondent gave a sworn statement to the ODC in which he agreed under oath to provide certain documentation within thirty days, including a copy of his employment contract with Mr. Jackson and evidence of work performed and communications with his client. Respondent failed to provide the documentation.
The ODC alleges that respondent's conduct violated Rules 1.3, 1.4, 1.5(a) (a lawyer's fee shall be reasonable) and/or 1.16(d), and 8.4(g) of the Rules of Professional Conduct.[2]

Count VI  The Fontenot Matter
In May 2002, Mary Alice Fontenot retained respondent to represent her *1056 minor son, Derrick Fontenot, in a personal injury matter. In September 2002, respondent settled Derrick's claim for $24,000. On October 9, 2002, respondent deposited the settlement check into his operating account, which at that time was overdrawn. Prior to disbursing the entirety of the settlement funds, respondent's operating account was frozen as the result of a personal judgment against him. Respondent did not complete the disbursement of funds to Derrick's medical providers until October 2003.
In August 2003, Ms. Fontenot filed a civil suit against respondent, specifically alleging that he had "failed to properly distribute the collected settlement funds to the medical care providers." In his answer to the petition, respondent denied Ms. Fontenot's allegation, notwithstanding that he still owed more than $3,000 to Opelousas General Hospital on Derrick's behalf.
During a sworn statement in March 2003, respondent admitted to the ODC that he had no client trust account at the time he received Derrick's settlement. Respondent opened a client trust account for the first time in January 2003.
The ODC alleges that respondent's conduct violated Rules 1.15(a), 1.15(d) (a lawyer shall create and maintain an interest-bearing trust account for clients' funds which are nominal in amount or to be held for a short period of time), 3.3(a)(1) (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal), and 8.4(c) of the Rules of Professional Conduct.

Count VII  The Charles Matter
Respondent was retained to handle the succession of Ronald Charles, Sr., who died survived by his second wife, Geraldine Charles, and by two children of his first marriage. In November 2002, respondent prepared and notarized an affidavit of death and heirship which attested that the decedent had been married only once. Respondent knew this information to be false at the time he notarized the affidavit. In January 2003, respondent filed a petition for possession on behalf of the decedent's two children. Despite the fact that the decedent had remarried prior to his death, respondent omitted any mention of the surviving spouse in the petition for possession and caused his clients to be placed into possession of the decedent's entire estate. The judgment of possession was signed on January 11, 2003.
In February 2003, the decedent's surviving spouse filed a petition to annul the judgment of possession. She also sought sanctions and other incidental relief. Following a hearing, the trial judge annulled the judgment of possession, and he ordered respondent and his clients to appear on April 7, 2003 for a contempt hearing. Respondent was subsequently discharged by his clients.
During the contempt hearing, the heirs testified that they had provided respondent with the correct information concerning the decedent's marital status. Respondent then admitted that he notarized the affidavit falsely attesting that the decedent was not married at the time of his death. The trial judge found respondent in direct contempt of court "for oversight at the least, fraud at the worst," and ordered him to pay attorney's fees and costs.
On April 9, 2003, respondent filed a petition for suspensive appeal of the contempt order only. However, he also argued in brief that the trial court erred in annulling the judgment of possession, notwithstanding that he had been discharged by his former clients and had withdrawn as their counsel of record. In December 2003, the Third Circuit Court of Appeal found respondent's appeal dealt with issues not *1057 pertaining to the judgment before the court, and which were relevant only to parties he no longer represented. The court further found respondent's appeal to be frivolous, and amended the trial court's judgment to award the appellee additional attorney's fees. In all other respects, the trial court's judgment was affirmed.
The ODC alleges that respondent's conduct violated Rules 3.1 (meritorious claims and contentions), 3.3, and 8.4(c) of the Rules of Professional Conduct.

Count VIII  The Failure to Cooperate Matter
On January 29, 2003, respondent was personally served with a subpoena compelling him to appear for a sworn statement on February 19, 2003 and to produce, among other things, his financial records relating to his representation of Derrick Fontenot, the client subject of Count VI, supra. Respondent failed to appear on that date. The ODC then arranged for respondent's appearance on March 19, 2003, and respondent confirmed in writing that he would appear "on Wednesday, March 19, 2003 at 10:00 a.m. at which time I will produce the documents requested." Nevertheless, when respondent appeared on March 19, 2003, he failed to produce the requested bank records.
During the sworn statement, respondent agreed under oath to provide the ODC with the bank records within thirty days. Before that time period elapsed, the ODC wrote a letter to respondent requesting that he execute a waiver which would permit the ODC to obtain the bank records directly from the financial institutions. Respondent failed to execute the waiver, and failed to provide the bank records as he had promised. The ODC subsequently obtained the records by a subpoena directed to respondent's bank.
The ODC alleges that respondent's conduct violated Rule 8.4(g) of the Rules of Professional Conduct.

Count IX  Respondent's Mishandling of Client and Third-Party Funds
Respondent's bank records demonstrate that he failed to maintain a client trust account for the period from December 1999 to January 2003. He did, however, maintain an operating account which also held client funds. Nevertheless, there were multiple overdrafts and significant and extended periods of negative balances in the account. Respondent did not reply to the ODC's written request that he explain the obvious commingling of client funds with his own and the apparent conversion of client and/or third-party funds.
The ODC alleges that respondent's conduct violated Rules 1.15(a), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(c), and 8.4(g) of the Rules of Professional Conduct.

DISCIPLINARY PROCEEDINGS
On April 14, 2004, the ODC filed nine counts of formal charges against respondent stemming from his misconduct as set forth above. The ODC alleged that the imposition of discipline, including permanent disbarment, is appropriate in light of the seriousness of respondent's actions. Respondent answered the formal charges and generally denied any misconduct.
Prior to the formal hearing, respondent submitted a memorandum in which he admitted some of the factual allegations contained in the formal charges; however, he denied any knowing or intentional misconduct on his part. Furthermore, respondent asserted that his misconduct resulted from poor practice management skills and therefore warranted only a fully deferred suspension.

*1058 Hearing Committee Recommendation

Based on the evidence presented at the four-day hearing in this matter, the hearing committee made the following findings:
Count I  The Boxie/Stoot Matter: The committee found that Mary Boxie hired respondent to handle a real estate transaction. Ms. Boxie gave respondent a check made payable to him for the purchase price of $4,500 on April 13, 2000. By his own admission, respondent did not maintain a client trust account. Instead, he deposited Ms. Boxie's check into an account containing his personal funds. At the time of the deposit, respondent's account had a negative balance. On April 14, 2000, respondent issued a check from his account to the seller, Joseph Stoot, in the sum of $4,155, and sent the check to Mr. Stoot, who resided out of state. Mr. Stoot deposited respondent's check into his bank, but it was returned NSF on April 26, 2000.
Mr. Stoot immediately contacted respondent about the returned check. Respondent agreed to make the check good and to reimburse Mr. Stoot the sum of $100 for "damages." On May 4, 2000, respondent made a deposit into his overdrawn account and immediately withdrew cash sufficient to purchase a certified check in the sum of $4,255 payable to Mr. Stoot. Mr. Stoot received the certified check on or about May 5, 2000.
At a sworn statement on March 21, 2001, respondent agreed to provide the ODC with copies of bank records of the account in question. Respondent never provided the ODC with the promised bank records.
Based on these findings, the committee determined that respondent commingled client funds with his personal funds, in violation of Rule 1.15(a); engaged in fraudulent conduct by causing the check issued to Mr. Stoot to be returned as NSF, in violation of Rule 8.4(c); and failed to provide copies of his bank records to the ODC, in violation of Rule 8.4(g).
Count II  The Unauthorized Practice of Law Matter: The committee found that respondent was ineligible to practice law from August 14, 2000 to September 7, 2000 because he did not meet his 1999 CLE requirements. The committee further found that respondent was aware of the deficiency prior to August 2000. Specifically, MCLE administrator Kitty Hymel testified that respondent received notice of the deficiency in December 1999, and had been given another reminder in April 2000, as well as notice from the Supreme Court dated July 14, 2000 that he would be ineligible to practice unless he cured the deficiency within 30 days. All correspondence was directed to respondent at the address he provided to the bar association, and the committee rejected any claims by respondent that he did not receive this mail.
Despite these notices, and specifically the court's July 14, 2000 order, respondent appeared before Judge Frank McGee of the 27th Judicial District Court on August 30, 2000, in the capacity of an attorney. Respondent was ineligible to practice law before Judge McGee on that date, but he did not notify Judge McGee of his ineligibility. When Judge McGee discovered respondent's ineligibility from other sources, the trial underway was disrupted. Respondent obtained the necessary credits for eligibility on September 1, 2000, after his ineligibility was discovered by Judge McGee.
Based on these findings, the committee determined that respondent practiced law when he was ineligible to do so. Furthermore, respondent did not alert Judge McGee or opposing counsel to his ineligibility prior to the commencement of trial, *1059 despite his knowledge of same; upon discovery by Judge McGee, the trial was disrupted at the expense of the court, the participants, and the public. Respondent's conduct violated Rules 5.5(a) and 8.4(d).
Count III  The Harrison Matter: Mary Harrison hired respondent to defend her daughter, Shantelle Harrison, who was charged with murdering her infant child. Respondent initially agreed to a fee of $5,000 which was paid by Mary over time. An additional amount of $2,500 was paid to respondent by Mary, and the reason for this fee is disputed. Respondent was successful in obtaining Shantelle's release on bond and also assisted the family in regaining custody of a second child born to Shantelle but removed from her custody. Respondent also pursued a motion to suppress evidence which was eventually denied. After a long delay in further pretrial proceedings, consisting of continuances by both the State and the defense, the matter came to trial in or about July 1998.
On the eve of trial, the State offered to allow Shantelle to plead guilty to manslaughter, without a cap in sentence. Respondent testified that he was not in favor of the plea because it did not contain a cap. The assistant district attorney, respondent, Shantelle, and her mother presented the possible plea to Judge Don Aaron. This took place at the end of jury selection. Apparently Judge Aaron detected some hesitance in the acceptance of the plea offer by Shantelle and did not accept the plea but rather instructed Shantelle to go home to ponder it with family. Shantelle discussed the matter with her mother but was reluctant to accept the plea because she did not want to return to jail.
That evening Shantelle and respondent spoke by telephone. The versions of that conversation differ. Shantelle contended that respondent convinced her not to accept the plea, in part, because he had located a nurse who would testify for her. Respondent admits that he did speak to a nurse who had been on duty when Shantelle was taken to the hospital and that he did relay that information to Shantelle. However, respondent explained that the nurse was not going to be a saving witness. Respondent contended that he did not tell Shantelle anything that would give her hope. Instead, respondent contended that Shantelle never expressed a desire to accept the plea. Shantelle, on the other hand, testified that she felt that this newly discovered nurse was a "miracle" and that she was further convinced by respondent not to accept the plea because he told her she would be victorious at trial. Respondent has consistently denied making any statement promising success. In any event, when the matter proceeded to trial the next day, respondent did not produce the nurse he and Shantelle had spoken of the night before.
Shantelle had been under the care of a psychiatrist, Dr. Samir Salama, after the infant's death. Respondent had planned to call the psychiatrist as a witness and had on several prior occasions subpoenaed him. During the prior trial fixings, respondent understood from Dr. Salama that a subpoena would not be necessary and that he would appear voluntarily to testify for Shantelle. When the matter finally came to trial in July 1998, respondent had not subpoenaed Dr. Salama. It was not until after the State completed its presentation of its case, on the morning that the defense began its presentation of evidence, that respondent learned that the psychiatrist could not appear as he was out of the country. Respondent did not offer testimony from Dr. Salama, nor did he attempt to have the trial continued because of Dr. Salama's unavailability.
*1060 The State intended to present evidence from a forensic pathologist, Dr. Emil Laga. Respondent did discuss with the Harrisons the potential need for medical evidence to counter the State's evidence, specifically, the use of a forensic pathologist. Respondent testified that he made inquiries about a consultation with a forensic pathologist but due to the costs did not secure the services of such an expert; he also did not consult with a forensic pathologist to review the autopsy report and conclusions of Dr. Laga.
At the trial, Shantelle testified in her own defense, as did family members and friends. Respondent offered no medical evidence. It is not clear what medical evidence could have been offered that would have changed the result of the trial. However, it is of no consequence what, if any, such evidence might have been since there is no evidence in the record that respondent made any effort to obtain such evidence and have it ready to be presented at trial. Shantelle was convicted of murder and sentenced to life imprisonment.
Three years later, in 2001, Shantelle, through new counsel, filed an amended and supplemental application for post-conviction relief alleging for the first time that the $2,500 paid to respondent was specifically to retain a pathologist to testify on her behalf. Additionally, for the first time, Shantelle alleged that she had been the victim of incest and had been raped by her father, who was the biological father of the child she had been accused of killing. Shantelle also alleged that though the State had offered a plea prior to trial, she had been influenced by respondent to decline it in favor of going to trial. Finally, Shantelle alleged that respondent told her that he had located a nurse who would testify beneficially for Shantelle, convincing her to decline the plea offer.
On March 26, 2001, Shantelle's application for post-conviction relief was heard before Judge Aaron, who had presided over the original murder trial. Judge Aaron found for Shantelle and reversed her conviction.
The committee noted that the testimony of Shantelle and Mary Harrison at the disciplinary hearing was markedly different from that provided at the hearing on post-conviction relief. Nevertheless, the committee found that respondent violated Rule 1.4 by failing to keep Shantelle and Mary Harrison reasonably informed about the status of the matter and failing to provide sufficient information to allow Shantelle to make an intelligent decision regarding the advisability of taking a plea versus going to trial. Respondent did not ensure that his only medical witness, Dr. Salama, would be available and did not inform his clients that Dr. Salama would not be available to testify. Nor did he inform his clients that he had no evidence to refute the opinion of the State's expert pathologist. Whether or not this information would have caused Shantelle Harrison to accept the plea offered at the beginning of trial cannot be said. It is obvious, however, that she was entitled to this information for the purpose of making her decision, and it is clear that it was not provided.
Further, respondent violated Rule 1.3 by failing to undertake the necessary investigation and preparation attendant with the serious threat of life imprisonment facing his client, and by ensuring that his witnesses were available and making an effort to determine whether the autopsy report of the State's expert was sound. This conduct also establishes a violation of Rule 1.1, as charged. Further, by failing to fully inform his client of the risks of going to trial, especially his failure to fully disclose his lack of evidence to call into question *1061 the State's case, and his failure to caution his client about the lack of significance of the nurse she considered to be a miracle and that he did not plan even to call, he also violated Rules 8.4(c) and (d).
With regard to the disputed $2,500, the committee noted that both Shantelle and Mary Harrison testified consistently that the additional $2,500 requested by respondent was specifically for securing the services of a pathologist. The ODC alleges that respondent was obligated to return this money when he failed to obtain the expert witness. Respondent categorically denied that the money was for a pathologist, but rather contends that the money was an additional attorney's fee over and above the $5,000 he already charged. Respondent further contends that he earned the fee and does not owe any money to the Harrisons.
The committee observed that there is no documentary evidence relevant to this question which would indicate the understanding of the parties. Therefore, the question becomes one of credibility. In deciding this question, the committee was "mindful of other charges, evidence and patterns of behavior exhibited by Respondent and his after-the-fact justifications of his conduct and failure to adequately account for sums received and failure to document his financial arrangements with his clients." Based on such, the committee found respondent's testimony in this instance was not credible, and concluded that he sought the fee under the auspices of needing to hire an expert, and that he failed to return the money or safeguard it in a trust account when he learned of the dispute, in violation of Rules 1.5(f)(6) and 1.16(d).
Finally, the committee found that respondent reasonably cooperated with the ODC in its investigation of the Harrison matter. The ODC sent written notices of the complaint to respondent on May 17, 2001 and June 6, 2001, which respondent received. The ODC sent a second notice to respondent on August 27, 2001. Respondent did respond in writing on September 6, 2001, received by the ODC on September 10, 2001. Therefore, as to Count III, the committee found that the ODC failed to prove by clear and convincing evidence that respondent violated Rule 8.4(g).
Count IV  The Williams Matter: In May 2001, Lee Jeffery Williams retained respondent to handle a parole matter and to explore the filing of a writ of habeas corpus to secure his release from prison. Mr. Williams made several efforts from prison to speak to respondent by telephone to determine the status of the matter, but was unsuccessful in speaking directly to respondent. When Mr. Williams could not reach respondent, he began communicating with the bar association, eventually requesting arbitration services in July 2001. The LSBA sent notice to respondent's address of record regarding his participation in fee arbitration, but the notice was returned. The LSBA sent a second notice to respondent on August 10, 2001. After respondent failed to respond to the request for fee dispute arbitration, the LSBA notified Mr. Williams of same on September 10, 2001. Mr. Williams then filed a complaint with the ODC.
On October 18, 2001, the ODC sent written notice of Mr. Williams' complaint to respondent, which he received on October 30, 2001. Respondent did not respond to the complaint, requiring the ODC to set up his appearance for a sworn statement on January 3, 2002. Respondent was duly served with a subpoena but did not appear. In the meantime, Mr. Williams decided to serve his full prison term and when released to go to respondent to recover the $500 fee. When Mr. Williams eventually *1062 did so, respondent instructed him to return at a later date for the money. Mr. Williams returned and was refunded the sum of $425 on May 8, 2002. Respondent did not specifically account to Mr. Williams for the $75 he retained.
When respondent did not respond to the complaint and did not appear for his sworn statement, the ODC set up another appearance for him at 10:00 a.m. on July 9, 2002. Respondent was duly served but did not appear at the time ordered. The ODC discovered that, instead, respondent had appeared in court on other matters. Later that afternoon respondent appeared before the ODC and stated under oath that he believed the matter had been set for 2:00 p.m. In any event, respondent acknowledged receiving the LSBA's request to arbitrate but confessed that he did not respond because "there is nothing to mediate."
Regarding the fee question, respondent told the ODC that "I charged him $75 because I went over to see him at Pine Prairie . . . which is about 45 minutes away from my office and the time I spent with him and driving back. That would be more than enough to cover the $75." Respondent did not report any other actions taken on behalf of Mr. Williams at his sworn statement before the ODC on July 9, 2002. At his disciplinary hearing on December 9, 2004, when asked by the ODC what he had done for Mr. Williams, respondent testified that he investigated the matter, spoke to the trial court, and "found out that a writ of habeas corpus was not the proper relief" for Mr. Williams. Considering this testimony, the committee found "a clear inconsistency exists in the explanations by Respondent of what he precisely did for Williams as well as the extent of his communications with Williams about what he had done and how much he was charging for that work."
Though respondent reported that within two months of his being retained that he had decided not to represent Mr. Williams further, Mr. Williams denied that he had been so advised. When Mr. Williams finally appeared at respondent's office to collect his refund, respondent's secretary corroborated that Mr. Williams believed that respondent was still his attorney. After she explained the refund and a written release Mr. Williams was to sign upon receipt of the refund, Mr. Williams then understood that respondent would no longer be his attorney.
The committee found that respondent did not effectively communicate with Mr. Williams about the fee to be charged, about the work done on his behalf, about his decision to forego further representation in the matter, and the accounting for his services and the fee ultimately charged. Respondent provided inconsistent sworn explanations regarding the work done and consequently the fee charged. Based on these findings, the committee determined that respondent violated Rule 1.5.
Furthermore, respondent violated Rule 8.4(g). He acknowledged receiving a notice to engage in arbitration and failed to respond. He acknowledged receiving the complaint filed by Mr. Williams and failed to respond. He was duly subpoenaed to appear for a sworn statement on two occasions and did not appear. On the second occasion of a sworn statement, respondent appeared after an inquiry as to his whereabouts was conducted by the ODC.
Count V  The Jackson Matter: Respondent was retained to represent Kerry Jackson, then an inmate, in three civil lawsuits that Mr. Jackson had already filed in proper person. Both agreed that respondent was retained on a contingent fee basis, and that written contingency contracts were signed; however, no written *1063 agreement was produced and the sworn testimony of Mr. Jackson and respondent differed in the amount of the contingency.[3] Furthermore, respondent requested and received three payments from Mr. Jackson which totaled $3,250. The committee found it was not clear what the precise terms of the payments were, nor the reasons for them. Mr. Jackson admitted that the first $1,500 payment was for a "retainer," which he paid to respondent in November 1999. Thereafter, respondent asked Mr. Jackson for and received $750 in May 2000, and asked for and received $1,000 in or about September 2002. Though an accounting was requested for the $3,250 paid to him, respondent never provided it to Mr. Jackson.
The committee found that respondent did perform legal work in each of the three separate matters and did travel to visit Mr. Jackson at his place of confinement several times. Nevertheless, the committee found that Mr. Jackson testified credibly that he was not kept advised as to the status of the proceedings. Mr. Jackson asked respondent several times for copies of documents and never received any. Mr. Jackson last met with respondent in or about December 2002. Each of the proceedings had been dismissed as of November 2000. In one of the proceedings, the convening of a medical review panel was necessary. Respondent did not convene the medical review panel nor did he advise Mr. Jackson of same. In another case, respondent was to take an appeal and did not. Mr. Jackson did not learn of these results until his testimony at the disciplinary hearing on November 3, 2004.
When Mr. Jackson received no communication from respondent, he wrote a letter to him which was returned. Mr. Jackson then filed his complaint with the ODC. The ODC requested from respondent a copy of contingency contracts and an accounting and copies of any communications provided to Mr. Jackson by respondent. Respondent failed to provide the requested information. During the course of the disciplinary hearing, for the first time, respondent provided a written itemization of the expenses he incurred in the handling of the Jackson matters in an admitted effort to show that his expenses far exceeded the sums paid to him. The committee questioned the written justification since the itemization was for hourly charges for attorney time, although respondent testified that he was working under a contingency agreement. At the next hearing, respondent provided a different itemization, this time for mileage costs. The committee found the accountings were "questionable in content and timing, since Respondent admitted that both were prepared for the purpose of this hearing, and were not provided to Jackson."
Based on these findings, the committee determined that respondent failed to keep Mr. Jackson fully informed of the status of the cases he was handling, especially the cases that had been dismissed without taking an appeal or convening the panels necessary. Respondent never communicated the precise nature of the monies advanced to him nor did he account to Mr. Jackson for same. This conduct violated Rules 1.3, 1.4, 1.5(a), and 1.16(d). Furthermore, respondent failed to comply with the ODC's requests for a copy of the contingency contracts signed, and never produced an *1064 accounting for the monies received from Mr. Jackson until the questionable accountings produced at the disciplinary hearing. The committee found the ODC established by clear and convincing evidence that respondent violated Rule 8.4(g).
Count VI  The Fontenot Matter: In February 2001, Mary Alice Fontenot retained respondent to handle a personal injury matter arising out of her son Derrick's involvement in an automobile accident. During the course of his representation, respondent advanced sums to Mary Alice. Finally, the matter was settled for a total of $27,000. Respondent did not maintain a client trust account. Instead, he deposited the $27,000 check into an account containing his personal funds. At the time of the deposit, the account had a negative balance and a portion of the $27,000 was seized and diverted to respondent's judgment creditor.
In settling the case, respondent obligated himself to pay certain medical expenses incurred by Mary Alice and Derrick. Respondent had issued several checks from his seized account to these medical providers and the remainder to Mary Alice for Derrick. Each of these checks was returned unpaid. The unpaid check issued to Mary Alice was eventually made good by a money order paid two months later. Unpaid checks to Baton Rouge General Hospital and the Metoyer Family Medical Center were made good by money orders. An unpaid check to Opelousas General Hospital (OGH), dated October 23, 2002 in the amount of $3,237, was not made good by respondent until one year later, after Mary Alice filed a civil suit against respondent.
Respondent contended to the ODC and in the disciplinary hearing that he did not know that the OGH check had been returned until October 2003, one year later. Respondent did make restitution of all the checks returned within two to three months, except the OGH check. Respondent claimed that he thought the OGH check had cleared. He claimed that he did not know that OGH had not actually been paid until he deposed Mary Alice in October 2003, during the course of the civil suit she had filed against him.
However, Dennis Thibodeaux, the director of business services for OGH, testified at the disciplinary hearing that in November 2002, he notified respondent's office, by telephone and letter, that the check was unpaid. The ODC contends that respondent's sworn testimony regarding the OGH check was false. In addition, the ODC contends that when respondent answered the suit filed by Mary Alice he falsely denied that he had mishandled the funds which were to have gone to the medical providers.
Respondent received funds from an insurance company for his clients as well as medical providers. Respondent deposited these funds into an account maintained by him and used by him, not into a client trust account. The ODC has established by clear and convincing evidence that respondent violated Rules 1.15(a) and 1.15(d).
Respondent's account was seized by his personal creditor for satisfaction of a personal debt, causing the checks issued to OGH and other providers to be returned as NSF. Respondent's claim that he was unaware that the check written to OGH was returned by the bank was rejected by the committee. Although respondent did produce a document which seems to indicate the bank had credited the Fontenot account based on the check he had sent, the testimony of Mr. Thibodeaux establishes that respondent was put on notice in November 2002, no more than a month after the check was sent, that the check had been dishonored. Moreover, the bank *1065 records for respondent's account also show that the check had been returned as NSF. Respondent cannot rely on one document to the exclusion of all other and later information available to him to the contrary. He was generally aware of the seizure of the account into which the Fontenot funds were deposited and the return of all of the checks written in connection with those funds. Respondent testified otherwise to the ODC, the committee, and in pleadings filed in the 27th Judicial District Court in connection with Ms. Fontenot's lawsuit. The ODC has established by clear and convincing evidence that respondent violated Rules 3.3(a)(1) and 8.4(c).
Count VII  The Charles Matter: The committee found that respondent clearly knew Ronald Charles, Sr. was survived by his wife. Mr. Charles' children retained respondent after their father died in October 2002. They revealed to respondent that shortly before their father died, he married his long time companion, Geraldine Charles, who was not their mother. The children were upset by their father's actions and expressed concern to respondent that Geraldine would dispose of their father's property. Nevertheless, respondent prepared certain succession documents, particularly an affidavit of heirship, which affirmatively stated that the decedent had married only once, out of which marriage only two children were born, namely respondent's clients. Respondent prepared such a document knowing that it was false and misleading. On November 19, 2002, respondent secured signatures to the false affidavit and notarized it.
Thereafter, respondent prepared a petition for possession and other documents, including a judgment of possession, in order to open and close the succession and have the court recognize his clients as sole heirs, all clearly omitting any reference to the surviving spouse. Respondent represents that an "oversight" occurred in the preparation of the documents and that "when it was brought to my attention that we had left off a current wife, as the affidavit indicates, we amended the petition to reflect that." The committee found these representations by respondent are not supported by other facts.
Respondent had the erroneous judgment signed and filed on January 10, 2003. He obtained certified copies and delivered them to his clients. Respondent was instrumental in having a law enforcement official accompany his clients with the certified copy of the judgment to serve Geraldine on January 11, 2003, demanding the release of certain property within Geraldine's control to respondent's clients. The widow Geraldine Charles immediately retained the services of an attorney, Gregory Marsiglia, on January 13, 2003.
On January 14, 2003, Mr. Marsiglia contacted respondent about what had occurred, alerting him to the need to correct the erroneous pleadings. On February 10, 2003, Mr. Marsiglia again spoke to respondent about the status of the corrected pleadings recognizing Geraldine as the surviving spouse. Having heard nothing further from respondent, Mr. Marsiglia filed a petition to annul the pleadings prepared and filed by respondent. A hearing was set on the petition to annul on March 14, 2003. On the morning of the hearing, shortly before it began, respondent filed amended pleadings correctly setting forth the position of Geraldine Charles, just as he had known from the inception.
A contempt proceeding was heard before the Honorable Thomas Duplantier regarding these circumstances, resulting in a finding by Judge Duplantier of "oversight at the least, fraud at the worst." Respondent was held in contempt. By then, respondent's former clients had retained other *1066 counsel. Respondent appealed Judge Duplantier's ruling, resulting in a ruling by the Third Circuit Court of Appeal that the appeal was frivolous, in large part because respondent asserted arguments on legal issues which pertained not to the finding of contempt but to the merits of the succession, at a time when respondent was not counsel for the major children.
The committee found that respondent clearly acted with knowledge of the existence of Geraldine Charles as surviving spouse. Respondent ignored this clear knowledge and prepared and signed documents which were potentially prejudicial to the interests of Geraldine Charles, and in doing so knowingly made false statements to a tribunal and offered evidence he knew to be false. He also engaged in dishonesty, deceit, and misrepresentation. Based on these findings, the committee determined the ODC established by clear and convincing evidence that respondent violated Rules 3.3 and 8.4(c). He also violated Rule 3.1 when he filed a frivolous appeal with the Third Circuit Court of Appeal.
Count VIII  The Failure to Cooperate Matter: On February 19, 2003, after respondent had not produced financial records as subpoenaed, the ODC and respondent agreed that he would appear and produce the records on March 19, 2003. Respondent did appear on that date but did not produce any records. The ODC and respondent then agreed that he would produce the records within 30 days. Thereafter, upon reflection, the ODC directed correspondence to respondent instructing him to execute an appropriate waiver allowing the ODC to obtain the records directly. Respondent did not execute the waiver nor did he provide the records, and the ODC was then required to obtain them through other means.
The committee found that respondent agreed to produce the records to the ODC. When the ODC provided an avenue by which the records could be obtained with ease, respondent refused. In any event, he did not provide the records as requested. The ODC has established by clear and convincing evidence that respondent violated Rule 8.4(g).
Count IX  Respondent's Mishandling of Client and Third-Party Funds: Once the ODC obtained the bank records of respondent's personal account, it discovered overdrafts and negative balances in the account, suggesting obvious commingling of client funds and apparent conversion of client and/or third-party funds. As a result, the ODC demanded an accounting from respondent of these banking irregularities. Respondent provided no accounting or explanation. At the disciplinary hearing, respondent admitted that he deposited client funds into his account and had negative balances in his account, thereby commingling and converting client funds to his own use, in violation of Rules 1.15(a) and 8.4(a). Respondent also violated Rule 8.4(c), given that his conduct of putting client funds into his own operating account and then allowing that money to be used for his personal needs and allowing those funds to be dissipated constitutes a pattern of dishonest behavior.
The committee determined that the baseline sanction for respondent's misconduct is disbarment. As aggravating factors, the committee recognized the following: prior disciplinary offenses, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, substantial experience in the practice of law, and indifference to making restitution. With regard to mitigating factors, the committee observed:
The Committee finds that almost no mitigating factors have been established by *1067 Respondent, except to the extent his restitution made to Joseph Stoot (count 1) and most of the creditors of Mary Alice Fontenot (count 6) were prompt restitution. The previous disbarment occurred in 1985, so it may be said to be remote, and the overall impression the Committee formed regarding the financial practices of Respondent was one of neglect and financial irresponsibility rather than criminal intent. To the extent these can serve as mitigating factors, then they are considered.
Under all the circumstances, the hearing committee recommended that respondent be disbarred.
The ODC objected to the committee's failure to recommend permanent disbarment. Respondent reiterated his assertion that a fully deferred suspension is appropriate for his misconduct because it stemmed from poor office management skills as opposed to a dishonest or selfish motive.

Disciplinary Board Recommendation
The disciplinary board reviewed the record and made the following findings:
Count I  The Boxie/Stoot Matter: The board found the hearing committee's findings of fact are supported by the record and that the committee properly applied the Rules of Professional Conduct. Respondent admitted that he violated Rule 1.15(a) by issuing Mr. Stoot a check from his office account in the amount of $4,155. Respondent also violated Rule 8.4(c). The check to Mr. Stoot was subsequently returned for insufficient funds because respondent commingled client, third-party, and personal funds and converted the client and third-party funds to his own use. Finally, respondent's failure to timely respond to the complaint and to provide the ODC with bank records as promised violated Rule 8.4(g).
Count II  The Unauthorized Practice of Law Matter: The board found the committee's findings of fact are supported by the record and that the committee properly applied the Rules of Professional Conduct. Respondent received notification of his failure to fully comply with the MCLE requirements for 1999. Despite these notifications, respondent failed to contact the bar association to discuss the problem or to take any independent action to correct the shortfall until he was denied the right to practice before Judge McGee. Accordingly, the committee correctly concluded that respondent violated Rules 5.5(a) and 8.4(d).
Count III  The Harrison Matter: The board found the committee's findings of fact are supported by the record and that the committee properly applied the Rules of Professional Conduct. Respondent's ineffective assistance of counsel stemmed from his failure to keep his client reasonably informed, failure to diligently pursue her case, and failure to ensure that witnesses were available to testify at trial. Accordingly, the committee correctly concluded that respondent violated Rules 1.1, 1.3, 1.4, 8.4(c), and 8.4(d) as charged. With regard to the disputed $2,500 fee, the committee correctly pointed out that there is no documentary evidence to support respondent's position that the additional $2,500 was payment for additional services rendered, including his representation of the family in the custody matter involving Shantelle Harrison's second child. Furthermore, the committee concluded that respondent's testimony on that point was not credible, a determination to which the board gave great deference. Therefore, the board found that no manifest error exists and the committee's findings relating to the issue of the disputed $2,500 fee are proper. Finally, the board agreed that the ODC failed to prove by clear and convincing evidence that respondent failed *1068 to cooperate in the investigation of the Harrison matter.[4]
Count IV  The Williams Matter: The board found the committee's findings of fact are supported by the record and that the committee properly applied the Rules of Professional Conduct. As pointed out by the committee, respondent has presented inconsistent statements as to what services were performed to earn any portion of the $500 fee. Accordingly, respondent has failed to promptly return an unearned fee in violation of Rule 1.5(f)(6). Furthermore, based on the evidence in the record, the board adopted the committee's conclusion that respondent failed to cooperate with the ODC in the investigation of Mr. Williams' complaint.
Count V  The Jackson Matter: The board found the committee's findings of fact are supported by the record and that the committee properly applied the Rules of Professional Conduct. The committee assessed the credibility of Mr. Jackson and that of respondent and determined that Mr. Jackson's testimony was more credible. Accordingly, no manifest error exists. Therefore, the board found the committee correctly concluded that respondent violated Rules 1.3, 1.4, 1.5(a), and 1.16(d). Finally, respondent's assertion that he would have provided an accounting to Mr. Jackson if he had requested one ignores his failure to provide an accounting as requested by the ODC. Accordingly, the committee correctly concluded that respondent violated Rule 8.4(g).
Count VI  The Fontenot Matter: The board found the committee's findings of fact are supported by the record (with the exception of an error as to the amount of Derrick Fontenot's settlement, which was $24,000, rather than $27,000, as stated by the committee) and that the committee properly applied the Rules of Professional Conduct. The board found convincing the committee's analysis that respondent knew or should have known that Opelousas General Hospital had not been timely paid, and that respondent violated Rule 3.3(a)(1) as charged. Furthermore, the evidence in the record amply demonstrates that respondent commingled and converted client and/or third-party funds in violation of Rules 1.15(a) and 8.4(c). Finally, respondent admitted that he failed to maintain a client trust account as required by Rule 1.15(d). Accordingly, the board adopted the committee's conclusion that respondent violated the Rules of Professional Conduct as charged.
Count VII  The Charles Matter: The board found the committee's findings of fact are supported by the record and that the committee properly applied the Rules of Professional Conduct. The board found convincing the committee's analysis that respondent knowingly made false statements to a tribunal and offered evidence he knew to be false, and that respondent violated Rules 3.3 and 8.4(c) as charged. Furthermore, the evidence in the record amply demonstrates that respondent appealed frivolous issues to the Third Circuit Court of Appeal. Accordingly, the board adopted the committee's conclusion that respondent violated Rule 3.1 as charged.
Count VIII  The Failure to Cooperate Matter: The board found the committee's findings of fact are supported by the record, but that respondent's actions do not rise to the level necessary to support a finding that he failed to cooperate with the ODC. The board noted that respondent took steps to obtain the requested bank records; however, prior to the expiration of the time limit agreed to by the ODC, disciplinary counsel independently obtained *1069 the requested bank records. In light of the ODC's actions, the board questioned "how Respondent's failure to then provide ODC with records which it already possessed constitutes a failure to cooperate." Accordingly, the board found that respondent did not violate Rule 8.4(g) as charged.
Count IX  Respondent's Mishandling of Client and Third-Party Funds: The board found the committee's findings of fact are supported by the record and that the committee properly applied the Rules of Professional Conduct. The committee correctly concluded that respondent violated Rules 1.15(a) and 8.4(a) by his failure to maintain a client trust account. Furthermore, as recognized by the committee, respondent's conversion of client and/or third-party funds constitutes dishonest conduct, in violation of Rule 8.4(c). Finally, the evidence in the record shows with convincing clarity that respondent failed to cooperate with the ODC in its investigation of his commingling and apparent conversion. Accordingly, he has violated Rule 8.4(g) as charged.
The board adopted the hearing committee's finding that respondent knowingly engaged in the practice of law while ineligible (Count II), knowingly failed to return an unearned fee to Mr. Williams (Count IV), knowingly failed to promptly pay a third-party provider on Ms. Fontenot's behalf and knowingly made a false statement to a tribunal concerning payment to the third-party provider (Count VI), knowingly filed a false petition and false affidavit in connection with the Charles matter (Count VII), and knowingly failed to cooperate with the ODC on multiple occasions. The board also agreed with the committee that respondent's financial misconduct was borne more out of neglect and financial irresponsibility than criminal intent. With regard to the remaining violations, the board found that at best respondent's actions demonstrated a combination of gross negligence and knowing misconduct. The board also found that respondent violated duties owed to his clients, the legal system, and the legal profession.
The board adopted the aggravating and mitigating factors found by the committee. As to the issue of restitution, the board noted that respondent still owes a $2,500 refund in connection with the Harrison matter, but that he made restitution to Opelousas General Hospital and returned disputed fees to Mr. Williams and Mr. Jackson prior to the institution of formal disciplinary proceedings. Accordingly, the board declined to find the aggravating factor of indifference to restitution is present in this matter.
Standard 4.12 of the ABA's Standards for Imposing Lawyer Sanctions provides for suspension when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. Although the record demonstrates that only Mr. Stoot and Ms. Fontenot suffered actual harm because of respondent's commingling and conversion of client and third-party funds, respondent's conduct nevertheless posed the risk of serious actual injury to all of his clients.
Standard 4.41(c) provides for disbarment when a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client. Respondent neglected his clients' legal matters on multiple occasions. Although difficult to accurately ascertain to what extent, in the Harrison matter (Count III), it is certain that respondent's lack of diligence played some role in his client's conviction. In the Jackson matters (Count V), Mr. Jackson's legal actions were not appealed by respondent nor did respondent notify Mr. Jackson that *1070 his suits were dismissed. Accordingly, Mr. Jackson lost the opportunity to timely choose whether or not to continue the pursuit of his legal matters.
Standard 6.11 provides for disbarment when a lawyer, with the intent to deceive the court, submits false documents, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding. Respondent's conduct in connection with Count VII (the Charles matter) falls squarely within the parameters of this standard. He knowingly submitted a false affidavit and a false petition with the intent to deceive the court into believing that Mr. Charles' children were the sole heirs and should be placed in possession of Mr. Charles' estate. As a result of respondent's actions, the surviving spouse was placed at risk of losing any rights she may have had to Mr. Charles' estate.
Standard 7.2 provides for suspension when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system. The profession has been harmed by respondent's failure to cooperate with the ODC and by his failure to adhere to the basic principles of ethics.
Respondent's conduct is clearly serious in nature, with the most disturbing involving his commingling and conversion of client funds. No less serious is respondent's knowingly making a false statement of material fact to a tribunal and his knowingly filing false documents. Taking all of respondent's misconduct as a whole, disbarment is clearly the appropriate baseline sanction.
Although the case law and the ABA guidelines support the imposition of disbarment in this case, and the hearing committee has recommended such, the ODC argues that the nature of respondent's misconduct and his prior disciplinary history warrant the imposition of permanent disbarment. The board agreed, finding respondent's conduct fits squarely within Guideline 9 of the permanent disbarment guidelines (instances of serious attorney misconduct preceded by suspension or disbarment for prior instances of serious attorney misconduct or conviction of a serious crime). Based on this reasoning, the board recommended that respondent be permanently disbarred. The board further recommended that respondent be ordered to make restitution in the amount of $2,500 to Mary Harrison (Count III), and that he be assessed with all costs and expenses of these proceedings.
Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992).
The hearing committee's factual findings, as modified by the disciplinary board, are supported by the record, and the committee properly applied the Rules of Professional Conduct. Collectively, the baseline sanction for respondent's numerous acts of misconduct is clearly disbarment. The board has concluded, however, that respondent's offenses are so egregious, particularly when considered in light *1071 of his prior disciplinary record, that he should be permanently prohibited from applying for readmission to the bar.
We agree. In Appendix E to Supreme Court Rule XIX, we set forth guidelines illustrating the types of conduct which might warrant permanent disbarment. While these guidelines are not intended to bind this court in its decision-making process, they present useful information concerning the types of conduct we might consider worthy of permanent disbarment. For purposes of the instant case, Guideline 9 is relevant:
GUIDELINE 9. Instances of serious attorney misconduct or conviction of a serious crime, when the misconduct or conviction is preceded by suspension or disbarment for prior instances of serious attorney misconduct or conviction of a serious crime. Serious crime is defined in Rule XIX, Section 19. Serious attorney misconduct is defined for purposes of these guidelines as any misconduct which results in a suspension of more than one year.
Guideline 9 clearly applies to the instant case. Respondent's misconduct at issue here is unquestionably serious attorney misconduct and was preceded by his 1985 disbarment stemming from his conviction of a serious crime. We find it particularly disturbing that once respondent regained the privilege of practicing law in 1991 he did not see fit to scrupulously conform his conduct to the Rules of Professional Conduct. Indeed, within just a few years of his readmission, respondent began engaging in the misconduct which forms the basis of these proceedings. Under these circumstances, we believe beyond any doubt whatsoever that respondent lacks the good moral character and fitness to practice law in Louisiana and should be permanently disbarred.
Accordingly, we will accept the disciplinary board's recommendation and impose permanent disbarment.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of Mack I. Frank, Louisiana Bar Roll No. 9954, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. Respondent is ordered to pay $2,500 in restitution to Mary Harrison. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
NOTES
[1] As the result of a .3 hour shortfall in his CLE hours for the calendar year 1999, respondent was declared ineligible to practice law for failure to comply with the MCLE requirements on August 14, 2000. He was reinstated to eligible status on September 7, 2000.
[2] The formal charges also alleged that respondent did not have a written contingent fee agreement with Mr. Jackson, a violation of Rule 1.5(c) (a contingent fee agreement shall be in writing). However, the ODC withdrew this charge at the formal hearing after Mr. Jackson testified that he did, in fact, sign a written contingency fee contract, which apparently has been lost.
[3] Mr. Jackson stated the contingency agreement was one-third, while respondent was unclear on precisely what the agreement was:

. . . probably just normal twenty-five percent or thirty-three and a third percent . . . In this case, it may have been thirty/forty. It may have been thirty/forty because it was outside of my area and then it was on cases that were kind of like a longshot because I didn't file the suit . . .
[4] The ODC does not contest this finding in its brief filed in this court.